Mr. Justice "WAYNE.
Concurring as I do entirely in tbe opinion of the court, as it has been written and read by tbe Chief Justice — without any qualification of its reasoning or its conclusions — I shall neither read nor file an opinion of . my own in this case, which I prepared when I supposed it might be necessary and proper for me to do so.
The opinion of the court meets fully and decides every point which was made in the argument of the case by the counsel on either side of it. Nothing belonging to the case has been left undecided, nor has any point beeli discussed and decided which was not called for by the record, or which was not necessary for the judicial disposition of it, in the way that it .has been done, by more than a majority of the court.
In doing this, the court neither sought nor made the case. „ It was brought to us in the course of that administration of ’ the laws which Congress has enacted, for the review of cases from the Circuit Courts by the Supreme Court.
■ In .our action upon it, we have only discharged our duty as .a distinct and efficient department of the Government, as the framers of the Constitution meant the judiciary to be, and as the States of the Union and-the people of those States.intended -it should be, when they ratified the Constitution of the United ".'States. " _
■. The case involves private rights of value, and constitutional principles of the highest importance, 'about which, there had *455 become such a difference of opinion, that' the peace and harmony of the country required the settlement of them by judicial decision.
It would certainly be a subject of regret,, that the conclusions of the court have not been assented to by all of its members, if I did not know from its history and my own experience how rarely it has happened that the judges have been unanimous upon constitutional questions of moment, and if our decision in this case had not been made by as large a majority of them as has been usually had on constitutional questions of importance.'
Two of the judges, Mr. Justices McLean and Curtis, dissent from the opinion of the court. A third, Mr. Justice Nelson, gives a separate opinion upon a single point in the case, with which I concur, assuming that the Circuit Court had jurisdiction; but he abstains altogether from expressing any opinion upon the eighth section of the act. of 1820, known commonly as the Missouri Compromise law, and six of us declare that it was unconstitutional.
But it has been assumed, that this court has acted extra-judicially in giving an opinion upon the eighth section of the act of 1820, because, as it lias decided that the Circuit Court had no jurisdiction of the case, this court had no jurisdiction to examine the ease upon its merits-. ,
But the error of such an assertion has ai'isen in part from a misapprehension of what has been heretofore decided by the Supreme Court, in cases of a like kind with that before us; in part, from a misapplication to the Circuit Courts of the United States, of the rules of pleading concerning pleas to the jurisdiction which prevail in common-law courts; and from its having been forgotten that this ease was not brought to this court by appeal or writ of error from a State court, but by a writ of error to the Circuit Court of the United States.
The cases cited by the Chief Justice to show that this court has now only done what it has repeatedly done before in other cases,, without any question of its correctness, speak for themselves. The differences between the rules concerning pleas to the jurisdiction in the courts of the United States and "common-law courts, have been stated and sustained by reasoning and adjudged cases; and it has been-shown that writs of error to a State court and to the Circuit Courts of the United States are-to be determined by different laws and principles. In the first, it is our duty to ascertain if this court has jurisdiction, under the twenty-fifth section of the judiciary act, to review the case from the State court; and if it shall be found that it has not, the case is at end, so far as this court is concerned; for our power *456 to review the ease upon its merits has been made, by the twenty-fifth section, to depend upon its having jurisdiction; when it has not, this court cannot criticise, controvert, or give any opinion upon the merits of a case from a State court.
But in a case brought -to this court, by appeal or by writ of error from a Circuit Court of the United States, we begin a review of it, not by inquiring if this court has jurisdiction, but if that court has it. „ If the case has been decided by that court upon its merits, but the record shows it to be deficient in those aver-ments which by the law of the United States must be made by the .plaintiff in the . action, to give the court jurisdiction of his case, we send it back to the court from which it was brought, with directions to be dismissed, though it has been decided there upon its merits.
So, in a case containing the averments by the plaintiff which are necessary to give the Circuit Court jurisdiction, if the defendant shall file his plea in abatement denying the truth of them, and the plaintiff shall demur to it, and the court should' erroneously sustain the plaintiff’s demurrer, or declare the plea to be insufficient, and by doing so require the defemlant to answer over by a plea to the merits, and shall decide the case upon such pleading, this court has the same authority to inquire into the jurisdiction of that court to do so, and to correct its error in that regard, that it had in the other case, to correct its error, in trying a case in Much the plaintiff had not made those averments which were necessaiy to give the court jurisdiction. ‘ In both cases the record is resorted to, to determine the point of jurisdiction; but, as the power of review of cases, from a Federal court, by this court, is not limited by the law to a part of the case, this court may correct an error upon the merits; and there is the same reason for. correcting an erroneous judgment of the Circuit- Court, where the want of jurisdiction appears from any part of the record, that there is for declaring a want of jurisdiction for a want of necessary averments. Any attempt to control the court from doing so by the technical common-law rules of pleading in cases of jurisdiction, when a defendant has been denied his plea to it, would tend to enlarge the jurisdiction of the Circuit Court, by limiting this court’s review of its judgments in that particular. But I will not argue a point already so fully discussed. I have every confidence in the opinion of ■ the court upon the point of jurisdiction, and do not allow myself to doubt that the error of a contrary conclusion wijl be fully understood by all who shall read the-argument of the Chief Justice.
I have already said that the opinion of the court has my unqualified assent. ■
*457 Mr. Justice NELSON.
. I shall proceed to state tbe grounds upon which I have arrived at the conclusion, that the judgment of the court below should be affirmed. The suit was brought in- the court below by the plaintiff, for the purpose of asserting his freedom, and that of Harriet, Lis wife, and two children.
The defendant plead, in abatement to the suit, that the cause of action, if any, accrued'to the plaintiff out of the .jurisdiction of the court, and exclusively.within the jurisdiction of the courts of the State of Missouri; for, that the said -plaintiff is not a citizen of the State of Missouri, as alleged in tie declaration, because.he is a negro of African descent; his ancestors were of pure African blood, and were bi’ought into this country and sold as negro slaves.
To this plea the plaintiff demurred, and the defendant joined in.demurrer. The court below sustained the demurrer, hold-'hat the plea was insufficient in law to abate the suit.
The defendant then plead over in bar of-the action:
1. The general issue. 2. That the plaintiff was- a negro slave, the lawful property of the defendant. And 3. That Harriet, the wife of said plaintiff, and the two ' children, were the lawful slaves of the said defendant. Issue was taken upon these pleas, and the cause went down to trial before the court and jury, and an agreed state of facts was presented, upon which the trial proceeded, and resulted in a verdict for the defendant, under the instructions of the court.
The facts agreed upon were substantially as follows:
That in the year 1834, the plaintiff, Scott, was a negro slave of Dr. Emerson, who was a surgeon in the army of the United States; and in that year he took the plaintiff from the State of Missouri to the military post at Rock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1836. At this date, Dr. Emerson removed, with the plaintiff, from the Rock Island post to the military post at Fort Snelling, situate on the west bank of the Mississippi river, in the Territory of Upper Louisiana, and north of the latitude thirty-six degrees thirty minutes, and north- of' the State of Missoui’i. That he held the plaintiff in slavery, at Fort Snelling, from the last-mentioned date until the year 1838.
That in the year 1835, Harriet, mentioned in the declaration, was a negro slave of Major Taliaferro, who belonged to the army of the United States; and in that year he took her to Fort Snelling, already mentioned, and kept her there as a slave until the year 1836, and then sold and delivered her to Dr. Emerson, who held her in slavery, at Fort Snelling, until the year 1838. That in the year 1836, the plaintiff, and Harriet *458 were married, at Eort Snelling, with • the consent of tbeir master. The two children, Eliza and Lizzie, are the fruit of this marriage. The first is about fourteen years of age, and was born on board the steamboat Gipsey, north of the State of Missouri, and upon the Mississippi river; the other, about seven yeai’s of age, was born in the State of Missouri, at the military post called Jefferson Barracks.
In 1888, Dr. Emerson removed the plaintiff, Harriet, ar.d their daughter Eliza, from Eort Snelling to the State of Missouri, where they have ever since resided. And that, before the commencement of this suit, they were sold by the Doctor to Sandford, the defendant, who has claimed and held them as slaves ever since.
The agreed case also states that the plaintiff brought a suit for his freedom, in the Circuit Court of the State of Missouri, on which' a judgment was rendered in his favor; but that, on a writ of error from the Supreme Court of the State, the judgment of the court below was reversed, and the cause remanded to the circuit for a new trial.
On closing the testimony in the court below, the counsel for the plaintiff prayed the court to instruct the jury, upon the agreed state of facts, that they ought to-find for the plaintiff; when the court refused, and instructed them that, upon the facts, the law was with the defendant.
'With respect to the plea in abatement, which went to the citizenship of the plaintiff, and his competency to bring, a suit in the Federal courts, the common-law rule of pleading is, that upon' a judgment against the plea on demurrer, and that the defendant answer over, and the defendant submits to the judgment, and pleads over to the merits, the plea in abatement is deemed to be waived, and is -not afterwards to be regarded as -a part of the record in deciding upon the rights of the parties. There is some question, however, whether this rule of pleading applies to the peculiar system and jurisdiction of the Eederal courts. As, in these courts, if the facts appearing on the record show that the Circuit Court had no jurisdiction, its judgment will be reversed in the appellate court for that cause, and the case- remanded with directions to be dismissed.
Tn the view we have taken of the case, it will not be necessary to pass upon this question, and we shall therefore proceed at once to an examination of the case upon its merits. The question upon the merits, .in general terms, is, whether or not the removal of the plaintiff, who was a slave, with his master, from the State of Missouri to the State of Illinois, with a view, to a temporary residence, and after such residence and *459 return to tbe slave State, sucb residence in tbe free State works an emancipation.
As appears from an agreed statement of facts, tbis question bas been before tbe highest court of tbe State of Missouri, and a judgment rendered that 'tbis residence in the free State bas no sucb effect; but, on tbe contrary, that bis original condition continued unchanged.
Tbe court below, the Circuit Court of tbe United States for Missouri, in which this suit was afterwards' brought, followed the- decision of the State court, and rendered a like judgment against the plaintiff. _
_ Tbe argument against these decisions is, that tbe laws of Illinois, forbidding slavery within her territory, bad tbe effect to set tbe slave free while residing in that State, and to impress upon him tbe condition and status of a freeman;, and that, by force of these laws, tbis status and condition accompanied him on bis .return to the slave State, and of consequence be coúld not be there held as a slave.
Tbis question has been examined in tbe courts of several of tbe slaveholding States, and different opinions expressed and conclusions arrived at. We shall hereaftér refér .to some of them, and to the principles .upon which they are founded. Our opinion is, that the question is one which belongs to each State to decide for itself, either by its Legislature or courts of justice; and hence, in respect to tbe ease before us, to tbe State of Missouri — a question exclusively of Missouri law, and which, when determined by that State, it is tbe duty of tbe Federal courts to follow it. In other words, except in cases where the power is restrained by tbe Constitution of tbe United States, tbe law of tbe State is supreme over tbe subject of slavery within its jurisdiction.
As a practical illustration of tbe principle, we may refer to tbe legislation of tbe free States in abolishing slavery, and prohibiting its introduction into their territories. Confessedly, except as restrained- by tbe Federal Constitution, they exercised, and rightfully, complete and absolute power over tbe subject. Upon what principle, then, can it be denied to tbe State of Missouri? The power flows from tbe sovereign character of tbe States of tbis Union; sovereign, not merely as fespects tbe Federal Government — except as they have consented to its limitation — but sovereign as respects each other. Whether, therefore, tbe State of Missouri will recognise or give effect to tbe laws of Illinois within her territories on tbe subject of slavery, is a question for her to determine. Nor is there any constitutional power in tbis Government that can rightfully control her.
*460 Every State or nation possesses an exclusive sovereignty and jurisdiction within her own territory; and, her laws affect and bind all property and persons residing within it. It may regulate the manner and circumstances under which property is held, and the condition, capacity, and state, of all persons therein; and, also, the remedy: and modes of administering justice. And.it is equally true, that no State or nation can affect or bind property out of its territory, or persons not residing within it. No State, therefore, can enact -laws to' operate beyond its own dominions, and, if it attempts to do so, it may be lawfully refused obedience. Such laws can have no inherent authority extra-territorially. This is the necessary result of the independence of distinct and separate sovereign-ties.
Now; it follows from these principles, that whatever force, or effect the laws of one State or nation may have in the territories of another, must depend solely upon the laws and municipal regulations of the latter, upon its own jurisprudence and polity, and upon its own express or tacit consent.
Judge Story observes, in his Conflict of Laws, (p. 24,) “that a State may prohibit the operation of all foreign laws, and the fights growing out of them, within its territóries.” “And that when its code speaks positively on the subject, it must he obeyed by all persons who are within'reach of its sovereignty; when its customary unwritten or common law speaks directly on the subject, it is equally to be obeyed.”
Nations, from convenience and cpmity, and from mutual interest, and a sort of moral necessity to do justice, recognise and administer the laws of other countries. But, of the nature, extent, and utility, of them, respecting property, or the state and condition of persons within her territories, each nation judges for itself; and is never bound, even upon the ground of comity, to recognise them, if prejudicial to her own interests. The recognition is purely from comity, and not from any absolute or paramount obligation.
Judge Story again observes., (898,) “ that the true foundation. and extent of the obligation of the laws of one nation within another is the voluntary consent of the latter, and is inadmissible when they are contrary to its known interests.” And he adds, “in'the silence of any positive rule affirming or denying or restraining the operation of the foreign laws, courts of justice presume the tacit adoption of them by their own Government, unless they are repugnant to its policy or prejudicial to its interests.” (See also 2 Kent Com., p. 457; 13 Peters, 519, 589.)
These principles fully establish, that it belongs to the sóver- *461 eign State of Missouri to determine by her laws tbe question of slavery within her jurisdiction, subject only to such limitations as may be found in the Federal Constitution; and, further, that the laws of other States of the Confederacy, whether enacted hy their Legislatures or expounded by their courts, can have no operation within her territory, or affect rights growing out of her own laws on the subject. This is the necessary result of the independent and sovei’eign character of the State.. The principle is not peculiar to the State of Missouri, but is equally applicable to each State belonging to the Confederacy. The laws of each have no extra-territorial operation within the jurisdiction of another, except such as may be voluntarily conceded by her laws or courts of justice. To the extent of such concession upon the rule of comity of nations, the foreign law may operate, as it then becomes a part of the municipal law of the State. When determined that the foreign law shall have effect, the municipal law of the State retires, and gives place to the foreign law.
In view of these principles, let us examine a little more closely the doctrine of those who maintain that the law of Missouri is not. to govern the status and condition of the plaintiff. They insist that the removal and temporary residence with his master in Illinois, where slavery is inhibited, had the effect to set him free, and that the same effect is to be given to the law of Illinois, within the State of Missouri, after his return. Why was he set free in Illinois? Because the law of Missouri, under which he.was-held.as a slave, had no operation by its own force extra-territorially; and the State of Illinois refused to recognise its effect within her limits, upon principles of comity, as a state of slavery was inconsistent with her laws, and contrary to her policy. But, how is the case different on the return of the plaintiff to the State of Missouri? Is she bound to'recognise and enforce the law of Illinois? Eor, unless she is, the status and condition of the slave upon his return remains the same as originally existed. Has the law of Illinois any greater force within the jurisdiction of Missouri, than the laws of the latter within that of the former? Certainly not. They stand upon an equal footing. Neither has any force extra-territorially, except what may be voluntarily conceded to them.
It has been supposed, by the counsel for the plaintiff that a rule laid down by Iluberus had some bearing upon this question. Huberus observes that “personal qualities, impressed by the laws of any place, surround and accompany the person wherever he goes, with this effect: that in every place he enjoys and is subject to the same law which other persons qf his *462 class elsewhere enjoy or are subject to.” (De Confl. Leg., lib. 1, tit. 3, sec. 12; 4 Dallas, 375 n.; 1 Story Con. Laws, pp. 59, 60.)
The application sought to be given to the rule was this: that as Dred Scott was free while residing in the State of Illinois, by the laws of that State, on his return to the State of Missouri he carried with him the personal qualities of freedom, and that the same effect must be given to his status there as in the former State. But'the difficulty in the case is in the total misapplication of thé rule.
■ These personal qualities, to which Huberus refers, are those impressed upon the individual by the law of the domicil; it is this that the author claims should be permitted to accompany the person into whatever country he might go, and should supersede the law of the place where he had taken up a temporary residence.
Now, as the domicij. of Scott was in the State of Missouri, where he was a slave, and from whence he was taken by his master into Illinois for a temporary residence, according to the doctrine of Huberus, the law of his domicil would have accompanied him, and during his residence there he would remain in the sainé condition as in the State of Missouri. In order to have given effect to the rule, as claimed in the argument, it should have been first shown that a domicil had been acquired in the free State, which cannot be pretended upon the agreed facts in the case. But the true answer to the doctrine of Huberus is, that the rule, in any aspect in which it may be viewed, haS no bearing upon either side of the question before ús, even if conceded to the extent laid down by the author; for he admits that foreign Governments give effect to these laws of the domicil no further than they are consistent with their own laws, and not prejudicial to their own subjects; in other words, their force and effect depend upon the law of comity of the foreign Government. "We should add, also, that this general rule.of Huberus, referred to, has not been admit-, ted in the practice of nations, nor is it sanctioned by the most. approved jurists of international law. (Story Con., sec. 91, 96, 103, 104; 2 Kent. Com., p. 457, 458; 1 Burge Con. Laws, pp. 12, 127.)
"We come now to the decision of this court in thé case of Strader et al. v. Graham, (10 How., p. 2.) The case came up from the Court of Appeals, in the. State of Kentucky. The question in the case was, whether certain slaves of Graham, a resident of Kentucky, who had been employed temporarily at several places in the State of Ohio, with their master’s consent, and had returned to Kentucky into his service, had thereby *463 become entitled to their freedom. The . Court of Appeals held that they had not. The case was brought to this court under -the twenty-fifth section of the Judiciary act. This court held that it -had no jurisdiction, for the reason, the question was one that belonged exclusively to the State of Kentucky. The Chief Justice, in delivering the opinion of the court, observed that “ every State has an undoubted right to determine the status or domestic and social condition of the persons domiciled within its territory, except in so far as the powers of the States in this respect are restrained, or duties and obligations imposed upon them, by the Constitution of the United States. There is nothing in the Constitution of- the United States, he observes, that can in. any degree control the law of Kentucky upon this subject. And the condition of the negroes, there- ■ fore, as to freedom or slavery, after their return, depended altogether upon the laws of that State, and could not be influenced by the laws of Ohio. It was exclhsively in the power of Kentucky to determine, for herself, whether their employment in another State should or should not make them free on their return.’’
■ It has been supposed, in the argument on the part of the plaintiff, that the eighth section of the act of Congress passed March 6, 1820, (3 St. at Large, p. 544,) which prohibited slavery north of thirty-six degrees thirty miutes, within which the plaintiff and his wile temporarily resided at Fort Snelling, possessed some superior. virtue and effect, extra-territorially, and' within the State of Missouri, beyond that of the laws of Illinois, or those of Ohio in the case of Strader et al. v. Graham. A similar ground was taken and urged upon the court in the case just mentioned, under the ordinance of 1787, which was enacted during the time 'of the Confederation, and reenacted by Congress after the adoption of the Constitution, with some amendments adapting it to the new Government.
(1 St. at Large, p. 50.)
_ ... In answer to this ground, the Chief Justice, in delivering the opinion of the court,, observed: “ The argument assumes that the six articles which that ordinance declares to be. perpetual, are still in force in the. States since formed within the territory, and admitted into the Union. If this proposition 'could be maintained, it would not alter the question; for the regulations of Congress,1 under the old Confederation or the present Constitution, for the government of a particular Territory, could have no force beyond its linlits. It certainly could not restrict the power of the States, within their respective territories, nor'in any maimer interfere with their laws and institutions, nor give this court control over them..
*464 “The ordinance' in question, he observes, if still in force, could have no more operation than the laws of Ohio in thé State of Kentucky, and could not influence the decision upon the rights of the -master or the slaves in that State.”
.This view, thus authoritatively declared, furnishes a conclusive answer to the distinction attempted to be set up between the extra-territorial eftect of a State law and the act of Congress in question.
It must be admitted, that Congress possesses no power to regulate or abolish slavery within the States; and that, if this act had attempted any such legislation, it would have been a nullity. And yet the argument here, if thez’e be any force in it, leads to. the result, that effect may be given to such legislation; for it is only by giving the act of Congress operation within the State of Missouri, that it can have any effect upon the question between the parties. Having no such effect directly, it will be difficult' to maintain, upon any consistent reasoning, that it can be made to operate indirectly upon the subject.
The argument, we think, in any aspect in which it may be viewed, is utterly destitute of support upon any principles of constitutional law, as, according to that, Congress has no power whatever over the subject of slavery within the State; and is also subversive of the established doctrine of international jurisprudence, as, according to that, it is an axiom that the laws of one Government have no force within the limits of another, or extra-territorially, except from the consent of the latter.
It is perhaps not unfit to potice, in this connection, that many of the most eminent statesmen and jurists of the country entertain the opinion that this provision of the act of Congress, even within the territory to which it relates, was not authorized by any'power under the Constitution. The doctrine here contended for, not only upholds its validity in the territory, but claims for it .effect beyond and within the limits of a sovereign State — an effect, as insisted, that displaces the laws of the State, and substitutes', its own provisions in their-place.
The consequences of any such construction are apparent. If Congress possesses the power, under the Constitution, to abolish slavery in a Territory, it must necessarily possess the like power to establish it. It cannot be a one-sided power, as may suit the convenience or particular views of the advocates. . It is a power, if it exists at all, over the whole subject; and then, upon the process of reasoning which seeks to extend its influence beyond the Territory, and within the limits of a State, if Congress should establish, instead of abolish, slavery, we do *465 not see but that, if a slave should be removed from the Territory into a free State, bis status would accompany him, and continue, notwithstanding its laws against slavery. The laws • of the free State, according to the argument, would be displaced, and the act of Congress, in its effect, be substituted in their place. "We do not see how this conclusion could be avoided, if the construction against which we are contending should prevail. "We are satisfied, however, it is unsound, ana that the true answer to it is, that even conceding, for the purposes of the argument, that this provision of the act of Congress is valid within the Territory'for which it was enacted, it can have no operation or effect beyond its limits, or within the jurisdiction of a State. It can neither displace its laws, nor change the status or condition of its inhabitants.
Our conclusion, therefore, is, upon this branch of the case, that the question involved is one depending solely upon the law of Missouri, and that the Federal court sitting in the State, and trying the case before us,- was bound to follow it.
The remaining question for consideration is, "What is the law of the State of Missouri on this subject? And it would be a sufficient answer to refer to the judgment of the highest court of the State in the very case, were it not due to that tribunal to state somewhat at large the course of decision and the principles involved, on account of some diversity of opinion, in the cases. As we have already’ stated, this case was. ■originally brought in the Circuit Court of the State, which-resulted in a judgment for.-the plaintiff. The case was carried, up to the Supreme Court for revision. That court reversed! the judgment below; and remanded the cause to the circuit, for a new trial. In that state of the proceeding, a new suit; was brought by the plaintiff in the Circuit Court ofthe United! ■ States, and tried upon the issues and agreed case before us,, and a verdict and judgment for the defendant, that • court following the decision of the Supreme Court of the States The judgment of the Supreme Court is reported in the 15 Misso. R., p. 576. The court placed the decision upon the» temporary residence of the master with the slaves in the State- and Territory to which they removed, and their return to the-slave State; and upon the principles of international law, that foreign laws have no extra-territorial force, except such as the-State within which they are sought to be enforced.may see fit; to extend to them, upon the doctrine of comity of nations..
This is the substance of the grounds of the decision.
The same question has been twice before that court since;, and the saíne judgment given, (15 Misso. R., 595; 17 Ib., 434.); It must be admitted, therefore, as the. settled law of the State, *466 and, according to the decision in the case of Strader et al. v. Graham, is conclusive of the case in this court.
It is said, however, that the previous cases and course of decision in the State of Missouri on this subject were different, and that the courts' had held the slave to be free on his return from a temporary residence in the free State. We do not see, were this to be admitted, that the circumstance would show that the settled course of decision, at the time this case was tried in the court below, was not to be considered the law of the State. Certainly, it must be, unless the first decision of a principle of law by a State court is to be permanent and irrevocable. The idea seems to be, that the courts of a State are not to change their opinions, or, if they do, the first decision is to be regarded by this court as the law of the State. It is certain, if this be so, in the case before us, it is an exception to the rule governing this court in all other cases. But what court has not changed its opinions ? What judge has not changed his ?
Waiving, however, this view, and turning to the decisions of the courts of Missouri, it will be found that there is no discrepancy between the earlier and the present cases upon this subject. There are some eight of them reported previous to the decision in the case before us, which was decided in 1852. The last of the earlier cases was decided in 1836.. In each one of these, with two exceptions, the master or mistress rémoved into the free State with the slave, with a view to a permanent residence — in other words, to make that his or her domicil. And in several of the cases, this removal and permanent residence were relied on, as the ground of the decision in favor of the plaintiff. All these cases, therefore, are not necessarily in conflict with the decision in the case before us, but consistent with it. In one of the two excepted cases, the master had hired the slave in the State of Illinois from 1817 tó 1825. In the other, the master was an officer in the army, and removed with his slave to .the military post of Port Snelling, and at Prairie du Chien, in Michigan, temporarily, while acting under the orders of his Government. It is ■ coneeded the decision in this case was departed from in the case before us, and in those that have followed it.' But it is to be observed that these subsequent cases are in conformity with those in all the slave States bordering on the free — in Kentucky, (2 Marsh., 476; 5 B. Munroe, 176; 9 Ib., 565)—in Virginia, (1 Rand., 15; 1 Leigh, 172; 10 Grattan, 495)—in Maryland, (4 Harris and McHenry, 295, 322, 325.) In conformity, also, with the law of England on this subject, Ex parte Grace, (2 Hagg. Adm., R., 94,) and with the opinions of the *467 most, eminent jurists of tbe country. (Story’s Confl., 396 a; 2 Kent Com., 258 n.; 18 Pick., 193, Chief Justice Shaw. See Corresp. between Lord Stowell and Judge Story, 1 vol. Life of Story, p, 552, 558.)
.) Lord Stowell, in communicating his opinion in 'the case of the slave Grace to Judge Story, states, in his letter, what the question was before him, namely: “Whether the emancipation of a slave brought to England insured a complete emancipation to him on his return to his own country, or whether it only operated as a suspension of slavery in England, and his original character devolved on him again upon his return.” He observed, “the question had never been examined since an end was put to slavery fifty years ago,” having reference to the decision of Lord Mansfield in the case of Somersett; but the practice, he observed, “has regularly been, that on his return to his own country, the slave resumed his original character of slave.” .And-so-Lord Stowell held in the case.
Judge Story, in his letter in reply, observes: “ I have read with great attention your judgment in the slave case, &c. Upon the fullest consideration which I have been able to give the subject, I entirely concur in your, views. If I had been called upon to pronounce a judgment in a like case, I should have certainly arrived at the same result.” Again he observes: “In my native State, (Massachusetts,) the state of slavery is not recognised as legal; and yet, if a slave should come hither, and afterwards return to his own home, we should certainly think that the local law .attached upon him, and that his servile character would b.e redintegrated.”
We may remark, in this connection, that the case before the Maryland court, already referred to, and which was decided in 1799, presented the same question as that before Lord Stowell, and received a similar decision. This was nearly thirty years before the decision in that case, which was in 1828. The Court of Appeals observed, in deciding the Maryland ease, that “however the laws of Great Britain in sueh instances, operating upon such persons there, might ifiterfere so as to prevent the exercise of certain acts by the masters, not permitted, as in the case of Somersett, yet, upon the bringing Ann Joice into this State, (then the province of Maryland,) the relation of master'and slave continued in its extent, as authorized by the laws of'this State.” And Luther Martin, one of the counsel in that case, stated, on the argument, that the question had been previously decided the same way in the case of slaves returning from a residence in Pennsylvania, where, they had become free under her laws.
The State of Louisiana, whose courts had gone further in *468 "holding the slave free on his return from a residence in a free State than the courts of her sister States, has settled the law, by an act of her Legislature, in conformity with the law of the court of Missouri in the case before us. (Sess. Law, 1846.)
The case before Lord Stowell presented much stronger features for giving effect to the law of England in the case of the slave Grace than exists in the cases that have arisen in this country, for in that case the slave returned to a colony of England over which the Imperial Government exercised supreme authority. Yet, on the return of the slave to the colony, from á temporary residence in England, he held that the original condition -of the slave attached. The question presented in cases arising here is as to the effect and operation to be given to the laws of a foreign State, on the return of the slave within, an independent sovereignty.
Upon the whole, it must be admitted that the current of authority, both in England and in this country, is in accordance with the law as declared by the courts óf Missouri in the case before us,.and we think the court below was not only right, but'bound to follow it.
Some question has been made as to the character of the residence in this case in the free State. But we regard the facts as sét forth in the agreed case as decisive. The removal of Dr. Emerson from Missouri to the military posts was in thé discharge of his duties as surgeon in the army, and under the orders of his Government. He was' liable at any moment to be recalled, as he was in 1888, and ordered to another post. The same is also true as it respects Major'Taliaferro. In such a case, the officer goes to his post for- a temporary purpose, to remain there for an uncertain time, and not for the purpose of fixing his permanent abode. The question we think too plain to require argument. The ease of the Attorney General v. Napier, (6 Welsh, Hurtst. and Gordon Exch. Rep., 217,) illustrates .and applies the principle in the case of an officer of the English army.
A question has been alluded to, on the argument, namely: the right of the master with his slave of transit into or through a free State, on business or commercial pursuits, or in the exercise of a Federal right, or the discharge of a Federal duty, being a citizen of the United States, which is not before us. This question depends upon different considerations and principles from the one in hand, and turns upon the rights and privileges secured to a common • citizen of the republic under the Constitution of the Unitéd States. When that question, arises, we shall be prepared to decide it. '
*469 Our conclusion is, that tlie judgment of tbe court below should be affirmed.